# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | **WILLIAM T. HART** | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 6396 | **DATE** | MARCH 28 , 2003 |
| **CASE TITLE** | JACQUELYN DODARO vs. VILLAGE OF GLENDALE HEIGHTS | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **Defendant's motion for summary judgment [14-1] is granted in part and denied in part. Counts I and II of the complaint are dismissed. In open court on May 14, 2003 at 11:00 a.m., the parties shall submit an original and one copy of a final pretrial order in full compliance with Local Rule 16.1 and Local Rule Forms 16.1.3.**

(11) ■ **[For further detail see attached Memorandum Opinion and Order.]**

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | 2 | **Document Number** |
| | No notices required. | number of notices | |
| ✓ | Notices mailed by judge's staff. | MAR 31 2003 | |
| | Notified counsel by telephone. | date docketed | 24 |
| | Docketing to mail notices. | | |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 3/28/03 | |
| cw | courtroom deputy's initials | date mailed notice | |
| | | mqm | |
| | | mailing initials | |

U.S. DISTRICT COURT
CLERK
03 MAR 28 PM 2: 23

Date/time received in
central Clerk's Office

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
MAR 3 1 2003

JACQUELYN DODARO,                     )
                                      )
                  Plaintiff,          )
                                      )
        v.                            )      No. 01 C 6396
                                      )
VILLAGE OF GLENDALE HEIGHTS,          )
                                      )
                  Defendant.          )


## MEMORANDUM OPINION AND ORDER


        Plaintiff Jacquelyn Dodaro is a former employee of
defendant Village of Glendale Heights, Illinois.  From November
1997 until August 2000, plaintiff was employed as the Office
Technician in defendant's Public Relations Department.  During
her employment, plaintiff had a substantial number of absences.
In June 2000, plaintiff was first diagnosed as having Meniere's
Disease, a condition which causes symptoms of imbalance and
dizziness as a result of too much fluid in the inner ear.  In
Count I of her complaint, plaintiff alleges that a 10-day
suspension in June 2000 was in violation of the Americans with
Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., in that
defendant discriminated against plaintiff because of her
disability and failed to provide her with a reasonable

24

accommodation. In Count II, plaintiff alleges her discharge also violated the anti-discrimination and reasonable accommodation provisions of the ADA. In Count III, plaintiff claims she was denied leave in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq., and wrongfully discharged in violation of the FMLA. Presently pending is defendant's motion for summary judgment as to all counts. Defendant contends any ADA claim should be limited to a reasonable accommodation claim because plaintiff failed to adequately raise an ADA discrimination claim before the EEOC. As to any ADA claim that is properly preserved, defendant contends the claim should be dismissed because plaintiff cannot show she was a "qualified individual," with or without an accommodation. As to the FMLA claim, defendant contends that plaintiff had already used her permitted FMLA leave for a 12-month period at the time she requested additional leave in May 2000.

On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant. Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002); Hilt-Dyson v. City Of Chicago, 282 F.3d 456, 462 (7th Cir.), cert. denied, 123 S. Ct. 97 (2002); Schneiker v. Fortis Insurance Co., 200 F.3d 1055, 1057 (7th Cir. 2000). The burden of establishing a lack of any genuine issue of material fact rests on the movant. Outlaw v. Newkirk, 259 F.3d 833, 837

(7th Cir. 2001); <u>Wollin v. Gondert</u>, 192 F.3d 616, 621-22 (7th Cir. 1999). The nonmovant, however, must make a showing sufficient to establish any essential element for which she will bear the burden of proof at trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>Billings v. Madison Metropolitan School District</u>, 259 F.3d 807, 812 (7th Cir. 2001). The movant need not provide affidavits or deposition testimony showing the nonexistence of such essential elements. <u>Celotex</u>, 477 U.S. at 324. Also, it is not sufficient to show evidence of purportedly disputed facts if those facts are not plausible in light of the entire record. See <u>NLFC, Inc. v. Devcom Mid-America, Inc.</u>, 45 F.3d 231, 236 (7th Cir.), <u>cert. denied</u>, 515 U.S. 1104 (1995); <u>Covalt v. Carey Canada, Inc.</u>, 950 F.2d 481, 485 (7th Cir. 1991); <u>Collins v. Associated Pathologists, Ltd.</u>, 844 F.2d 473, 476-77 (7th Cir.), <u>cert. denied</u>, 488 U.S. 852 (1988). As the Seventh Circuit has summarized:

> The party moving for summary judgment carries the initial burden of production to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." <u>Logan v. Commercial Union Ins. Co.</u>, 96 F.3d 971, 978 (7th Cir. 1996) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (citation and internal quotation omitted)). The moving party may discharge this burden by "'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." <u>Celotex</u>, 477 U.S. at 325, 106 S. Ct. 2548. Once the moving party satisfies this burden,

the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The nonmovant must do more, however, than demonstrate some factual disagreement between the parties; the issue must be 'material.'" Logan, 96 F.3d at 978. "Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute." Id. (citation omitted). In determining whether the nonmovant has identified a "material" issue of fact for trial, we are guided by the applicable substantive law; "[o]nly disputes that could affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." McGinn v. Burlington Northern R.R. Co., 102 F.3d 295, 298 (7th Cir. 1996) (citation omitted). Furthermore, a factual dispute is "genuine" for summary judgment purposes only when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Hence, a "metaphysical doubt" regarding the existence of a genuine fact issue is not enough to stave off summary judgment, and "the nonmovant fails to demonstrate a genuine issue for trial 'where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party . . . .'" Logan, 96 F.3d at 978 (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).

Outlaw, 259 F.3d at 837.

Resolving all genuine disputes and drawing all reasonable inferences in plaintiff's favor, the facts assumed to be true for purposes of ruling on defendant's motion for summary judgment are as follows. In November 1997, plaintiff was hired as a part-time Office Technician in defendant's Public Relations Department. At the time she was hired, plaintiff did not indicate that she had any special health needs. Also, plaintiff was provided a copy of

defendant's Employee Manual[1] which she read.  As to the FMLA, the
Employee Manual states that an employee is entitled to leave of
absence without pay in accordance with the terms of the FMLA.

On February 20, 1998, plaintiff began working full-time.
The Public Relations Department is responsible for disseminating
information about Village departments and events.  The only other
employee in the Department was plaintiff's supervisor, Gina
Thorson.  On some occasions, Office Technicians from other
departments would provide assistance.  The parties agree that the
essential functions and duties of the position "include:
(a) inputting information into the Village's character generator
to be broadcast over cable and government access channels,
(b) putting together and distributing the Village's newsletters,
(c) generating press releases, (d) putting up information on the
Village's marquees, (e) programming the Village's videotape
playback system, (f) inputting information into the Village's HTE
financial system, (g) archiving photographs and videos from
Village events, (h) answering phone calls from the public to the
Public Relations Department regarding Village services, policies,

----

[1]The parties and/or testimony they cite variously refer
to a "handbook," "manual," "employee manual," and "Employee
Handbook."  No copy of a document with any of those titles has
been provided.  In today's opinion, this document will be
referred to as the "Employee Manual."  The parties also refer to
and provide excerpts from a document titled "Personnel Policy
Manual."  It will be assumed that the Employee Manual and
Personnel Policy Manual are two different documents.  It is
possible, though, that "handbook," "manual," "employee manual,"
and "Employee Handbook" are simply misnomers for the Personnel
Policy Manual.

or events, and (i) receiving the public and answering questions at the front desk."  The position necessitates working with employees of other departments in order to gather information. Sometimes, information must be disseminated on a sudden and unexpected basis.  Some of the equipment that must be used is located only at the Village Hall.

Paid benefits of defendant's employees include vacation days, floating holidays, and sick days.  An employee may also apply for leave of absence without pay which would constitute an authorized absence.  From February 20, 1998 until the end of the calendar year, plaintiff was absent from work 221.5 hours.[2]  At least 56 of those hours were covered by paid benefits.  In calendar year 1999, plaintiff was absent from work approximately

---

[2]Defendant provides the affidavit of Human Resources Officer Ann Scharf and plaintiff's time records.  Scharf states the number of hours plaintiff was absent each year based on the time records.  Scharf also conclusorily refers to a certain number of hours of "unauthorized leave."  However, with the exception of plaintiff's last couple months of employment, the time records do not indicate whether any particular absence is unauthorized.  Additionally, the time records are not always clear as to whether certain absences were with or without pay or even as to whether certain time off was for sick pay.  For example, notations in the margins for a particular day do not always match up with the total hours shown at the bottom of each biweekly time card.  See, e.g., 6-4-99 and 6-18-99 time cards. The parties, though, do not appear to disagree as to the number of hours that plaintiff was absent.  Plaintiff does dispute the number of hours that Scharf claims she was on unauthorized leave. (In her affidavit, it is unclear whether plaintiff denies having any unauthorized absences or simply denies the total unauthorized hours that Scharf states for each particular year.)  Since the time cards do not support Scharf's conclusory statements as to the number of hours of unauthorized leave for each year, those statements will not be credited.

590.75 hours, of which approximately 120 hours were covered by paid benefits and approximately 472 hours were unpaid FMLA leave.[3] In September 1999, plaintiff applied for 12 weeks of FMLA leave because of a back injury[4] and an ovarian tumor. Plaintiff was on approved FMLA leave from August 17, 1999 to November 9, 1999. From January 1 through May 31, 2000, plaintiff was absent 132.5 hours. At least 92.5 of those hours were covered by paid benefits and plaintiff had available vacation time that could have covered the remainder. On May 31, 2000, plaintiff requested FMLA leave. Plaintiff was permitted to use her vacation time to cover further absences through June 8. Plaintiff requested an unpaid leave of absence for a time period after June 8, but that request was denied. Defendant considered all the time off after June 8 to be unauthorized leave. Plaintiff did not return to work after the May 31 episode and was eventually discharged effective August 18, 2000.

On May 1, 1998, plaintiff received a performance evaluation from her supervisor. An issue was raised as to plaintiff's absences, which plaintiff acknowledged and she also agreed an improvement in her attendance was necessary. In her

---

[3]Scharf states plaintiff had a total of 590.75 hours of total absences. However, she also states this consisted of 120 hours of paid leave, 472 hours of FMLA leave, and 10.75 hours of unauthorized leave, which would total 602.75 hours.

[4]The back injury occurred at a second job that plaintiff was working at during the same time period as her employment with defendant.

November 1998, February 1999, and February 2000 evaluations, plaintiff's absences were also raised as an issue.

In February 2000, plaintiff sought to transfer to an Office Technician position in the Finance Department. At her deposition, plaintiff stated that she sought this transfer in order to get away from the stress and abuse of working for Thorson. Due to her history of absenteeism, the transfer request was denied.

On May 31, 2000, while at work, plaintiff had an episode of imbalance and dizziness and was taken away in an ambulance. Plaintiff requested that her remaining vacation time be used and it was applied until exhausted on June 8, 2000. At least for purposes of summary judgment, defendant does not dispute that, before leaving on May 31, plaintiff requested unpaid FMLA leave. The FMLA leave request was denied on the ground that plaintiff had already used 12 weeks of such leave within the preceding 12 months.

Dr. Sam Marzo was plaintiff's primary treating physician for her Meniere's Disease. When Dr. Marzo first examined plaintiff on June 12, 2000, he concluded she had an imbalance/dizziness problem that was caused by Vestibular Neuronitis, Meniere's Disease, or Perilymphatic Fistula. Dr. Marzo also concluded plaintiff was indefinitely unable to work because she was being treated with Valium. Dr. Marzo considered it unsafe to work while on Valium because a person could not drive to work or operate machinery, and also because

plaintiff was at risk of falling if she had to use any stairs or could fall walking in the office. On June 22, 2000, Dr. Marzo concluded that the cause of plaintiff's problem was Meniere's Disease. He continued to express the same view regarding her ability to work. In a letter dated June 26, 2000, Dr. Marzo informed the village that plaintiff had a "balance problem" and he recommended that she not work until her balance recovers.

Sometime between June 8 and June 22, 2000, Thorson determined that plaintiff should be suspended because of her then being on unauthorized leave and because of her past history of absenteeism. Effective June 22, 2000, plaintiff was suspended for 10 days. Plaintiff contends she was not on unauthorized leave at the time because defendant's Personnel Policies Manual provides that "[e]mployees on IMRF [Illinois Municipal Retirement Fund] disability pension or other disability are not classified as being on leave of absence" and therefore cannot be on unauthorized leave. However, although plaintiff's IMRF disability benefits were effective June 1, 2000, plaintiff was not awarded those benefits until after she was discharged. It was not until approximately July 6, 2000 that defendant first learned plaintiff had even applied for IMRF disability. Plaintiff also points to being awarded disability benefits through her second job that were effective June 11, 2000. Again, there is no evidence that plaintiff had applied for these benefits as of the date the suspension decision was made and the actual disability award was apparently made after the suspension

occurred. Also, defendant was unaware of these disability benefits until after plaintiff was discharged. Additionally, although the Personnel Policy Manual does not expressly define "other disability", defendant's Human Resources Director states that the term "other disability" as used in the above quoted passage refers to "employee" disability benefits, which means benefits from being an employee of defendant, not disability benefits through another employer. She represents that "other disability" is meant to refer to disability benefits available to other Village employees, for example, police officers, who are covered by plans other than the IMRF disability plan.

For at least two to three months after May 31, 2000, plaintiff could not manage her household affairs, she had dizziness spells that sometimes lasted for hours, and she fell down on a couple occasions. By July or August, plaintiff's equilibrium had improved some so that, in her words, she was "walking like a little drunk person." She could not focus enough to cross-stitch and half the time did not answer the telephone because her speech was slurred. She could "watch some TV," but was "basically . . . a vegetable." At her August 14, 2000 appointment with Dr. Marzo, plaintiff's condition was worse than it had been during her June appointments. Dr. Marzo continued to opine that plaintiff should remain off work indefinitely. At her September 11, 2000 appointment, plaintiff was in the same condition as in June and Dr. Marzo continued to opine that she be off work indefinitely. Following monthly examinations through

mid-February 2001, Dr. Marzo continued to opine that plaintiff was unable to work. On February 28, 2001, plaintiff had inner ear surgery in an attempt to correct the problem. No evidence is presented regarding plaintiff's condition following surgery.

Plaintiff characterizes four requests that she made as requests for accommodations. In February 2000, she requested a transfer to a different Office Technician position. In early June 2000, plaintiff requested being able to work in a wheelchair, work at home, and/or additional leave time. All four requests were denied.

On August 15, 2000, plaintiff had a meeting with defendant's Village Administrator and Assistant Village Administrator. They discussed plaintiff's attendance problems throughout her tenure and her then ability to work. It was determined that plaintiff's employment would be terminated effective August 18, 2000 because of excessive absenteeism. In deciding to discharge plaintiff based on excessive absenteeism, defendant took into account the 1999 absence for which FMLA leave was granted and the leave after June 8, 2000 for which FMLA leave was denied.[5]

---

[5]Without citing any additional evidence, defendant asserts that the 1999 FMLA leave was not part of the basis for discharging plaintiff. However, both the Village Administrator and Assistant Village Administrator testified at their depositions that they considered plaintiff's 1999 FMLA leave in making the decision to discharge her.

Defendant's Administrative Policy 98-04 dated April 27, 1998 states defendant's "Family & Medical Leave Policy." Included is the following:

> All regular employees who meet the applicable time-of-service requirements may be granted a total of twelve (12) weeks (480 hours) of unpaid and paid sick, vacation and personal leave combined Family and Medical leave, during any 12 month period. The 12-month period is defined as a "rolling" 12-month period measured backward from the date an employee uses any Family and Medical leave. Under this method, each time an employee takes Family and Medical leave, the remaining leave entitled will consist of any balance of the 12 weeks which has not been used during the immediately preceding 12 months.

Since September 2000, Policy 98-04 has been an attachment to defendant's Employee Manual. It was not part of that Manual when plaintiff was an employee. However, when Policy 98-04 was first issued, a copy was provided to each employee and a copy was posted on the employee bulletin board for three to six months. Additionally, a copy was provided to plaintiff when she applied for FMLA leave in 1999. As of May 31, 2000, more than two years after it had been issued, Policy 98-04 was not posted on the employee bulletin board nor incorporated in defendant's Employee Manual.

The FMLA claim will be considered first. The FMLA entitles a covered employee to 12 weeks of leave each 12 months for a serious health condition that prevents the employee from working. 29 U.S.C. § 2612(a)(1)(D). The dispute in the present case concerns how the 12-month period is measured. The parties

agree that, if the "rolling" 12-month period is applied, plaintiff was not entitled to any FMLA leave as of June 2000 because she had used the entire 12 weeks within the preceding twelve months (August 17, 1999 to November 9, 1999).[6] The parties also agree that, if FMLA leave is measured by the calendar year, she would have been entitled to 12 weeks of FMLA leave any time in 2000 because the prior use of FMLA leave had been in 1999. Further, the parties agree that either method is permissible under applicable regulations and that it is within the employer's discretion to select which method to use. See 29 C.F.R. §§ 825.200(b), (d). The parties' disagreement is as to whether defendant properly elected the rolling period.

The regulations provide: "Employers will be allowed to choose any one of the alternatives in paragraph (b) of this section provided the alternative chosen is applied consistently and uniformly to all employees. An employer wishing to change to another alternative is required to give at least 60 days notice to all employees, and the transition must take place in such a way that the employees retain the full benefit of 12 weeks of leave under whichever method affords the greatest benefit to the employee. Under no circumstances may a new method be implemented in order to avoid the Act's leave requirements."

---

[6]Neither party notes that the FMLA leave actually used in 1999 was approximately 472 hours, leaving a possible 8 remaining hours for use. Also, even applying the rolling method, plaintiff was entitled to begin using FMLA leave again on August 18, 2000, the date on which her discharge became effective.

Id. § 825.200(d)(1). It is further provided that, "[i]f an employer fails to select one of the options . . ., the option that provides the most beneficial outcome for the employee will be used." Id. § 825.200(e). See also Hunt v. Rapides Healthcare System, LLC, 277 F.3d 757, 765-66 (5th Cir. 2001); Bachelder v. America West Airlines, Inc., 259 F.3d 1112, 1126-29 (9th Cir. 2001).

Section 825.200 itself does not delineate the particular means by which the employer may elect one of the methods of counting the 12-month period. However, the general notice provision of the FMLA regulations provides:

> If an FMLA-covered employer has any eligible employees and has any written guidance to employees concerning employee benefits or leave rights, such as in an employee handbook, information concerning FMLA entitlements and employee obligations under the FMLA must be included in the handbook or other document. For example, if an employer provides an employee handbook to all employees that describes the employer's policies regarding leave, wages, attendance, and similar matters, the handbook must incorporate information on FMLA rights and responsibilities and the employer's policies regarding the FMLA.

29 C.F.R. § 825.301(a)(1).[7] Further § 825.301(f) provides that,

---

[7]Section 825.301(a)(2) provides:
If such an employer does not have written policies, manuals, or handbooks describing employee benefits and leave provisions, the employer shall provide written guidance to an employee concerning all the employee's rights and obligations under the FMLA. This notice shall be provided to the employee each time notice is given pursuant to paragraph (b), and in accordance with the provisions of that paragraph.

"[i]f an employer fails to provide notice in accordance with the provisions of [§ 825.301], the employer may not take action against an employee for failure to comply with any provision required to be set forth in the notice." 29 C.F.R. § 825.301(f). Since defendant had an Employee Manual during all pertinent times, plaintiff contends that, regardless of the written copies of Administrative Policy 98-04 that defendant did provide to her, defendant's election of the rolling method was ineffective as to plaintiff because the rolling method election was not incorporated into the Employee Manual until after plaintiff was discharged, which was more than two years after Policy 98-04 was issued.

The only case that has been cited or found that considers the issue of the notice requirement for a § 825.200(b) election is Bachelder, 259 F.3d at 1126-29. That case holds that a § 825.200(b) election is not effective unless the notice requirement of § 825.301(a) is satisfied as regards the election. Id. at 1127-28. See also 60 Fed. Reg. 2180, 2200 (Jan. 6, 1995) ("Employers must inform employees of the applicable method for determining FMLA leave entitlement when informing employees of their FMLA rights."). If the notice required by § 825.301(a) is not satisfied, then the election of the rolling method is ineffective and, in accordance with § 825.200(e), the § 825.200(b) method to be applied is the one most favorable to the employee. Bachelder, 259 F.3d at 1128. In Bachelder, the employer had an employee handbook. The handbook stated that

"employees are entitled to up to twelve calendar weeks of unpaid
[FMLA] leave within any twelve month period." See id. at 1129.
This language was held to be insufficient to state that the
rolling method had been elected. Id. Since there was no other
written notification of an election of the rolling method, it was
held that § 825.300(e) applied in determining the applicable
12-month period. Id.

Similar to Bachelder, defendant's Employee Manual and
Personnel Policy Manual contained only a general reference to the
FMLA. They state that an employee is entitled to a leave of
absence without pay according to the terms of the FMLA. Like
Bachelder, there was no statement in the Employee Manual provided
to plaintiff (or the Personnel Policy Manual) stating that the
rolling method is used in determining eligibility for leave.
Unlike Bachelder, however, Dodaro was provided a separate written
document stating defendant's FMLA policy, including an express
statement that the rolling method would be used in determining
eligibility for FMLA leave. This written document was provided
directly to plaintiff both when the policy was first instituted
and when she first applied for such leave in 1999. The policy
was also posted on an employee bulletin board for a number of
months while plaintiff was an employee.

In plaintiff's view, the separate written notice does not
satisfy the requirements of § 825.301(a)(1) because the written
notice was not actually incorporated in the Employee Manual that
existed while plaintiff was an employee. However, whether there

is such a requirement depends on how § 825.301(a)(1)'s phrase "included in the handbook or other document" should be read.[8] Parsed to the words presently pertinent, the sentence reads: "If [there is] any written guidance . . ., such as in an employee handbook, information . . . must be included in the handbook or other document." This could be read as meaning that, if a handbook exists, it is sufficient to include the information in either "the handbook or other document." Or it could be read as meaning that, if there is a handbook, the information must be in the handbook; whereas, if there is no handbook, but some other type of document that constitutes written guidance, the information must be in that other document. To be consistent with a goal of enabling employees to stay aware of the applicable rules, see Bachelder, 259 F.3d at 1127 (quoting 60 Fed. Reg. at 2219), the regulation should be construed as requiring that the election be incorporated in a permanent written document such as a handbook, not simply conveyed in what could be a one-time, stand-alone "other document." If part of the handbook, an employee would be able to go to the handbook as a reference guide when contemplating FMLA leave. If contained in a stand-alone document received at one time in the past, an employee would be less likely to recall and/or be able to locate the document.

_____

[8]In Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 161 (2d Cir. 1999), the Second Circuit refers to the notice provisions of sections 825.301(a) and 825.301(b) being "highly ambiguous," but without specifying what aspects it found to be ambiguous.

Even in plaintiff's particular situation, she may not have been able to locate the copy of Policy 98-04 that she had received approximately eight months earlier when first seeking FMLA leave. Also this construction is consistent with the next sentence of § 825.301(a)(1) which provides: "For example, if an employer provides an employee handbook to all employees that describes the employer's policies regarding leave, wages, attendance, and similar matters, the handbook must incorporate information on FMLA rights and responsibilities and the employer's policies regarding the FMLA."[9] Consistent with its purpose, § 825.301(a)(1) is construed as requiring that defendant have incorporated the rolling method election in the Employee Manual. Defendant did not do so until September 2000, which was after plaintiff had retired and almost 2½ years after Administrative Policy 98-04 was issued.

Since the evidence supports that defendant did not properly elect the rolling method, the method more favorable to plaintiff must be employed. See 29 C.F.R. § 825.200(e); Bachelder, 259 F.3d at 1128. Under the calendar-year method, see 29 C.F.R. § 825.200(b)(1), plaintiff would have been entitled to 12 weeks of FMLA leave as of June 2000.[10] On the facts presently

---

[9]It could be argued that this sentence is distinguishable because it assumes there is only a handbook and not some additional document that also contains FMLA provisions.

[10]There is no contention that any of the sick or other leave taken earlier in 2000 should be counted as part of the allowable 12 weeks of FMLA leave.

before the court, it must be assumed that plaintiff should have been granted FMLA leave effective June 1, 2000 (or possibly effective June 9, 2000 after exhaustion of paid leave).[11]

In her brief, plaintiff contends that, in violation of 29 U.S.C. § 2615, she was discharged or discriminated against for exercising FMLA rights. Defendant does not challenge this contention on factual grounds, but contends that such a claim may not be raised because not included in the complaint. It is true that plaintiff's complaint does not include a citation to § 2615, or even § 2614. The complaint also contains no use of the words interference, retaliation, or discrimination in relation to FMLA rights.[12] A plaintiff, however, need not plead or specifically identify the legal basis for a claim; she is only required to plead facts that would support a cause of action. Kirksey v.

---

[11]In its brief, defendant refers to plaintiff "purportedly" requesting FMLA leave. Defendant may intend to raise at trial a question as to whether plaintiff ever sufficiently requested FMLA leave. However, an employee need only request leave related to a serious health condition; she is not required to make a specific reference to the FMLA. See 29 C.F.R. §§ 825.302(c), 825.303(b); Collins v. NTN-Bower Corp., 272 F.3d 1006, 1008 (7th Cir. 2001); Stoops v. One Call Communications, Inc., 141 F.3d 309, 312 (7th Cir. 1998); Price v. City of Fort Wayne, 117 F.3d 1022, 1025-26 (7th Cir. 1997).

[12]Plaintiff does allege she was treated differently than similarly situated persons without a disability. Complaint ¶ 15. The reference to disability, however, is clearly a reference to discrimination prohibited by the ADA, not discrimination for exercising FMLA rights. Similarly, reference to including discrimination in the EEOC charge is limited to the ADA claim. See id. ¶ 18. Additionally, the allegations of "reckless indifference to Plaintiff's federally protected rights" are references to rights under the ADA. See id. ¶¶ 16, 22.

R.J. Reynolds Tobacco Co., 168 F.3d 1039, 1041-42 (7th Cir. 1999); Gilmore v. Southwestern Bell Mobile Systems, L.L.C., 224 F. Supp. 2d 1172, 1175 (N.D. Ill. 2002). Incorporated in the Count III FMLA claim is ¶ 20, which alleges "Plaintiff was terminated from her employment by Defendant on August 18, 2000 for alleged abuse of sick time and excessive absenteeism." Also, as to her FMLA claim, plaintiff alleges she lost wages. Since the FMLA leave would have been without pay, plaintiff clearly is referring to subsequent wages and thus alleging that she lost her position in violation of the FMLA. Under § 2614 of the FMLA, plaintiff would have been entitled to be returned to her Office Technician or an equivalent position upon the completion of her 12 weeks of FMLA leave. Plaintiff's allegations encompass a claim for violation of § 2614(a)(1)'s restoration rights, which itself is considered interference with FMLA rights in violation of § 2615(a)(1).[13] See Kohls v. Beverly Enterprises Wisconsin,

---

[13]Evidence before the court supports that plaintiff would have still been unable to perform her duties when the 12 weeks of FMLA leave would have expired in September 2000. Under such circumstances, there would ordinarily be no claim based on denial of § 2614 restoration rights. See 29 C.F.R. § 825.214(b); Sarno, 183 F.3d at 161; Oatman v. Fuji Photo Film U.S.A., Inc., 2002 WL 245972 *2-3 (N.D. Tex. Feb. 15, 2002), aff'd by unpublished order, 54 Fed. Appx. 413 (5th Cir. Nov. 12, 2002); Madison v. Sherwin Williams Co., 158 F. Supp. 2d 854, 859 (N.D. Ill. 2001); Sewall v. Chicago Transit Authority, 2001 WL 40802 *10 (N.D. Ill. Jan. 16, 2001). On summary judgment, however, defendant does not raise this issue so it will not be considered. Even if plaintiff would have been available to return to work after 12 weeks, her claim would not succeed if defendant discharged her for other legitimate reasons, including for other absences for which plaintiff was not entitled to FMLA leave. See Ogborn v. United Food and Commercial Workers Union, Local No. 881, 305 F.3d 763,

Inc., 259 F.3d 799, 804 (7th Cir. 2001). Additionally, the allegation that plaintiff was discharged for alleged abuse of sick time and absenteeism can be construed as alleging she was discharged in violation of § 2615. Discharging a person for being absent when she should have been granted FMLA leave constitutes interference with FMLA rights in violation of § 2615(a)(1). Bachelder, 259 F.3d at 1124-26. Plaintiff's FMLA claim will not be limited to denial of leave time and the direct effects that had; she may also continue to pursue allegations that she was discharged in violation of § 2614 and § 2615.[14]

Turning to the ADA claims, defendant's first contention is that plaintiff failed to raise an ADA disparate treatment claim before the EEOC. On April 4, 2001, plaintiff filed a charge with the EEOC. The charge reads as follows:

> I began my employment with Respondent part time in October 1997. I was hired as a full time Office Technician for Public Relations in February 1998. I began exhibiting symptoms of my disability on or about January 2000. I was denied transfer to another department on April 28, 2000. I began a medical leave of absence on May 31, 2000. I was issued a suspension notice on June 22, 2000 for excessive absenteeism. I was terminated on August 17, 2000. I filed union grievances for the suspension and wrongful termination. I attempted to return to work with restrictions in October

---

768 (7th Cir. 2002); Bachelder, 259 F.3d at 1125; Johnson v. Moundsvista, Inc., 2002 WL 2007833 *6 (D. Minn. Aug. 28, 2002).

[14]To avoid any possible continuing confusion, plaintiff may seek leave to amend her complaint to expressly include allegations that she was discharged in violation of § 2614 and § 2615.

> 2000, and Respondent denied me reasonable
> accommodation and return to work.
>      I believe I was discriminated against
> because of my disability, in violation of the
> Americans with Disabilities Act of 1990.

In the charge, plaintiff is claiming that she was denied accommodations to be able to return to work.  She also claims that she was discriminated against in being suspended and terminated.  Contrary to defendant's contention, the charge refers to both a denial of reasonable accommodation and disparate treatment because of an alleged disability.  Defendant's contention that plaintiff failed to adequately preserve her claim of disparate treatment is without merit.

Defendant's other contention as to the ADA claim is that plaintiff was not a qualified individual with a disability.  For purposes of summary judgment, defendant does not dispute that plaintiff's condition constitutes a disability under the ADA.  The issue raised on summary judgment is whether plaintiff was a qualified individual.  Defendant contends plaintiff was not a qualified individual because, with or without an accommodation, she could not perform all the essential functions of an Office Technician.

To qualify for protection under the ADA, a person must be "a qualified individual with a disability."  42 U.S.C. § 12112(a); Dvorak v. Mostardi Platt Associates, Inc., 289 F.3d 479, 483-84 (7th Cir. 2002); Winfrey v. City of Chicago, 259 F.3d 610, 614 (7th Cir. 2001); Moore v. J.B. Hunt Transport, Inc.,

221 F.3d 944, 950 (7th Cir. 2000); Nowak v. St. Rita High School, 142 F.3d 999, 1002 (7th Cir. 1998). The burden is on plaintiff to show that she is a qualified individual with a disability. Cleveland v. Policy Management Systems Corp., 526 U.S. 795, 806 (1999); Winfrey, 259 F.3d at 614; Moore, 221 F.3d at 950; Nowak, 142 F.3d at 1002. A qualified individual with a disability is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); Winfrey, 259 F.3d at 614; Nowak, 142 F.3d at 1002.

The only medical evidence before the court is the deposition testimony of Dr. Marzo and the work status or return to work forms that he completed. From June 12, 2000 through mid-February 2001, Dr. Marzo found that plaintiff was unable to return to work because of balance problems, including from the effects of being treated with Valium, that prevented plaintiff from walking, going on stairs, or driving. Plaintiff contends that this does not show that she was unable to work because none of those activities were essential functions of the Office Technician position. She points to Marzo's testimony that he found her lucid when he talked to her on the telephone on a few occasions and contends she could have performed the essential functions of her position had she been granted one or more of her requested accommodations. The burden is on plaintiff to show that she could have performed her essential duties with a

reasonable accommodation.  Cleveland, 526 U.S. at 806, Winfrey, 259 F.3d at 614.

Dr. Marzo's testimony included that plaintiff was unable to walk without risk of falling, not just that she could not walk on stairs or drive.[15]  However, there is also plaintiff's own testimony.  She testified that, as of July or August when her equilibrium had improved some, she was still unable to focus enough to stitch, her speech was slurred, and she was still basically a vegetable.  It was part of plaintiff's essential job duties that she answer the telephone and interact with the public.  Her slurred speech would not permit her to perform that function.  Also, the fact she could not focus enough to cross-stitch also indicates that she would be unable to focus on putting together newsletters and press releases or programming the equipment she was responsible for.  Additionally, her testimony does not support that she would have been able to handle working a full day.  Furthermore, performing her essential duties required that plaintiff at least be able to move around the Village Hall, which, even without stairs, plaintiff's doctor did not recommend because of the risk of falling.

Plaintiff's proposed accommodations do not deal with all these problems.  As to switching positions, plaintiff did not

_____

[15]The testimony of Dr. Marzo that is provided is unclear as to whether the Valium and/or Meniere's Disease would have also caused cognitive problems that would interfere with plaintiff's performance of her job functions.  On defendant's summary judgment motion, such a conclusion, therefore, cannot be drawn from his testimony.

request that as an accommodation for her medical condition.  But
even if it were considered, plaintiff points to no evidence as to
what the essential functions of the other Office Technician
position were.  Therefore, she has not met her burden of showing
that such an accommodation would have enabled her to perform the
essential duties of the other Office Technician position.
Plaintiff also requested to work at home.  However, the
interaction with the public aspect of her position, the
programming of equipment, and projects necessitating quick
dissemination of information all required that she be at Village
Hall to perform her essential duties.  As to being permitted to
work part-time, there is no evidence that the duties assigned to
her position could have been performed part-time.  Also, even if
working part-time, plaintiff would still have the slurred speech
and focusing problem that would prevent her from performing all
the essential functions of her position.  Plaintiff's last
requested accommodation is to use a wheelchair.  There is no
medical evidence that that would be sufficient or feasible.[16]
Plaintiff provides a conclusory statement in her affidavit that
she could have performed her essential duties in a wheelchair.
But even assuming the wheelchair would solve the risk of falling
problem, it would not solve the problem of slurred speech and
lack of ability to focus.  Plaintiff has not met her burden of

---

[16]When asked about her using a wheelchair, Dr. Marzo
responded that he had not considered that and then did not answer
whether, in his opinion, it would have allowed her to work.

showing that she could have performed the essential functions of an Office Technician had she been granted one or more of her accommodations. Therefore, she is not a qualified individual with a disability and cannot succeed on an ADA claim. The ADA claims will be dismissed.

IT IS THEREFORE ORDERED that defendant's motion for summary judgment [14-1] is granted in part and denied in part. Counts I and II of the complaint are dismissed. In open court on May 14, 2003 at 11:00 a.m., the parties shall submit an original and one copy of a final pretrial order in full compliance with Local Rule 16.1 and Local Rule Forms 16.1.3.

ENTER:

_William T. Hart_
UNITED STATES DISTRICT JUDGE

DATED: MARCH 28 , 2003